UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division

| | |
|---|---|
| IN RE:    THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, Inc., Debtor | Bankruptcy Case No. 24-00676 |
| MEDMARC CASUALTY INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>STAUNTON & FAGLIE, PL; JOHN W. STAUNTON; FLOYD FAGLIE,<br><br>      Defendants, and<br><br>THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.; CLARK CHAMBERLIN, BY AND THROUGH HIS PARENTS AND CO-GUARDIANS TODD AND KELLI CHAMBERLIN, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED; SHAWNTA ORRIS, AS GUARDIAN AD LITEM ON BEHALF OF T.L., A DISABLED ADULT, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; AND CAROL MULHOLLAND, AS GUARDIAN ADVOCATE OF THE PERSON AND PROPERTY OF JF, A VULNERABLE AND DISABLED ADULT,<br><br>      Nominal Defendants. | Adv. Pro. No. _____ |

## ADVERSARY COMPLAINT
## FOR DECLARATORY JUDGMENT

Plaintiff MEDMARC CASUALTY INSURANCE COMPANY ("Medmarc"), by and through its undersigned counsel, hereby sues Defendants, STAUNTON & FAGLIE, PL; JOHN W. STAUNTON; FLOYD FAGLIE; and Nominal Defendants, THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC. (the "Center"); CLARK CHAMBERLIN, by and through his parents and co-guardians TODD AND KELLI CHAMBERLIN, on behalf of themselves and all others similarly situated; SHAWNTA ORRIS, as Guardian Ad Litem on behalf of T.L., a Disabled Adult, and on behalf of all others similarly situated; and CAROL MULHOLLAND, as Guardian Advocate of the Person and Property of JF, a vulnerable and disabled adult, for declaratory relief and states:

## NATURE OF THE CASE

1.     This is a civil action brought by Medmarc for a declaratory judgment, pursuant to 28 U.S.C. § 2201, that there is no coverage, or that coverage is limited, under Lawyers Professional Liability Insurance Policy No. 23MCFL000142 (the "Policy"), with respect to certain liability claims made against the Named Insured, defendant Staunton & Faglie, PL ("SF"), and against defendants, John W. Staunton ("Staunton") and Floyd Faglie ("Faglie").  These liability claims arise from or relate to purported loans from special needs trust accounts managed by the Center to a third-party investment firm, Boston Finance Group, LLC ("BFG"), which is owned and controlled by the Center's founder and former board member, Leo Govoni ("Govoni").

2.     Defendant Staunton co-founded the Center with Govoni. Staunton, Faglie, and SF allegedly provided legal services to the Center and the trust beneficiaries.

- 2 -

3.      Nominal Defendants to this lawsuit include the Center, as well as creditors of the Center who have filed separate suits against, *inter alia*, Staunton, Faglie, SF, or some combination thereof.

## JURISDICTION AND VENUE

4.      All conditions precedent to the filing of this action have occurred or have been complied with.

5.      This Bankruptcy Court has original but not exclusive jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(c)(1), because it is "related to" a case under title 11 of the Bankruptcy Code.  Specifically, this action is related to the proceeding captioned, *In re The Center for Special Needs Trust Administration, Inc.*, Case No. 24-00676, in the United States Bankruptcy Court for the Middle District of Florida (Tampa Div.) ("Bankruptcy Proceeding"), wherein the Center is the Debtor. This declaratory judgment action is related to the Bankruptcy Proceeding because Debtor claims that Medmarc's insureds, defendants SF, Staunton, and Faglie, are legally obligated to pay damages to the Center and/or the Nominal Defendants and assert that the Policy provides coverage for such damages.

6.      This action is not a "core" proceeding under 28 U.S.C. § 157(b)(1) or § 157(b)(2) of the Bankruptcy Code.

## PARTIES

7.      At all times material to this action, Plaintiff Medmarc is and was a Vermont corporation with its principal place of business in Virginia. Medmarc issued the Policy to the Named Insured, Staunton & Faglie, PL (defendant "SF" herein), for the period incepting March 23, 2023 until its cancellation on December 31, 2023 (attached as *Exhibit A* hereto).

8.      At all times material to this action, Defendant SF is and was a Florida limited liability company with its principal place of business in Pinellas County, Florida. SF is and was a law firm and it was the Named Insured under Policy.

9.      At all times material to this action, Defendant Staunton is and was a resident and citizen of Florida.  Staunton was an attorney employed by or associated with SF.  He claims rights as an insured under the Policy.

10.     At all times material to this action, Defendant Faglie is and was a resident and citizen of Florida.  Faglie was an attorney employed by or associated with SF.  He claims rights as an insured under the Policy.

11.     The following parties are designated Nominal Defendants because they have asserted claims, threatened to assert claims, filed lawsuits, or threatened to file lawsuits against Medmarc's insureds, for which SF, Staunton and/or Faglie have sought a defense or coverage under the Policy:

(a)     **The Center for Special Needs Trust Administration, Inc.**  At all times material to this action, the Center is and was a Florida Not For Profit Corporation with its principal places of business in Pinellas County, Florida. Nominal Defendants contend that SF, Staunton, and/or Faglie are liable for damages resulting from certain acts committed during the course of their work for the Center.

(b)     **Clark Chamberlin, by and through his parents and co-guardians Todd and Kelli Chamberlin, and on behalf of themselves and all others similarly situated (the "Chamberlins").**  At all times material to this action, Todd and Kelli Chamberlin are and were residents and citizens of the State of Florida,

residing in Palm Beach County. They filed a putative class action complaint in the United States District Court for the Middle District of Florida, on behalf of their disabled minor son and on behalf of other similarly situated trust grantors and beneficiaries, styled *Chamberlin et al. v. Boston Finance Group, LLC, et al.*, Case No. 24-CV-000438 (the "Chamberlin Class Action"). The operative Amended Complaint alleges, *inter alia*, that $100 million of trust account funds were lost and/or stolen via two unauthorized loans. The Chamberlins contend BFG, Govoni, Staunton, and other defendants including Jonathan Golden, effectuated the loans by virtue of their direct involvement with the Center and converted the trust account funds for their own use.

(c)   **Shawnta Orris, as Guardian Ad Litem on behalf of T.L., a Disabled Adult, and on behalf of all others similarly situated ("Orris").** At all times material to this action, Orris is and was a resident and citizen of the State of Nebraska, residing in Douglas County. She filed a putative class action complaint in the United States District Court for the Middle District of Florida, as Guardian Ad Litem on behalf of her father T.L., a disabled adult, and on behalf of all others similarly situated, styled *Orris v. Govoni, et al.*, Case No. 24-CV-000874 (the "Orris Class Action"). The operative Amended Complaint alleges, *inter alia*, that $100 million of trust account funds were misappropriated via two unauthorized loans effectuated by various entities and individuals, including Govoni, BFG, Staunton, and officers and board members of the Center.

(d)   **Carol Mulholland, as Guardian Advocate of the Person and Property  of JF, a vulnerable and disabled adult ("Mulholland").**  Mulholland, on behalf

- 5 -

of her disabled adult daughter, is the plaintiff in the case now styled *Carol Mulholland, as Guardian Advocate of the Person and Property of JF, a vulnerable and disabled adult v. Floyd Faglie, Floyd Faglie, P.L., and Staunton & Faglie, P.L.*, Case No. 24-CA-002303, pending in the Circuit Court of the Thirteenth Judicial Court in and for Hillsborough County, Florida (the "Mulholland Lawsuit"). In the operative Amended Complaint, Mulholland contends that as a result of the actions and conduct of defendants, including Faglie and SF, JF's trust account funds were mishandled or misappropriated.

12.     The parties identified in Paragraph 10 (a) – (d) have asserted liability claims against one or more of Medmarc's insureds that are Defendants in this action (SF, Staunton, and/or Faglie). As such, those parties' future rights may be affected by the adjudication of this action to determine the existence or scope of insurance coverage for those liability claims. Accordingly, the Nominal Defendants are proper parties to this action and should be bound by the adjudication thereof. *See e.g. Balfour Beatty Constr., LLC v. Zurich Am. Ins. Co.*, No. 2:13-cv-205-FtM-38CM, 2014 U.S. Dist. LEXIS 39148 (M.D. Fla. Mar. 24, 2014); *Amerisure Ins. Co. v. Acousti Eng'g Co.*, No. 6:10-cv-863-Orl-31GJK, 2011 U.S. Dist. LEXIS 165997 (M.D. Fla. Mar. 8, 2011).

## FACTUAL ALLEGATIONS

13.     **Overview.**  As detailed below, various related claims and lawsuits have been asserted against, *inter alia*, the Center, SF, Staunton, and/or Faglie.  Read together, these claims and suits allege that BFG, Govoni, and Staunton, among others, effectuated the unauthorized transfer of two loans totaling $100 million from special needs trusts ("SNTs") for which the Center served as corporate trustee and for which the insureds purportedly provided services, resulting in the misappropriation of funds meant to benefit the SNT beneficiaries.

- 6 -

14.     In 2000, Govoni and Staunton founded and incorporated the Center as a 501(c)(3) organization to provide trust administration services for SNT beneficiaries and their representatives, and to serve as trustee for those SNTs.

15.     SNTs are specialized trusts that are generally established for elderly or disabled beneficiaries and are typically funded by way of settlements or recoveries from personal injury actions.

16.     The Center's primary purpose is to serve as trustee of the SNTs, which involves maintaining trust records, responding to requests for distributions, and effectuating distributions in a manner so as to ensure the respective beneficiary continues to qualify for public assistance benefits.

17.     Nominal Defendants contend that Staunton, Faglie, and/or SF rendered services to the Center and/or SNT beneficiaries by drafting SNT agreements, representing the Center in negotiations with beneficiaries, representing the interests of the grantors of the SNTs, and appearing on behalf of the Center and/or the SNT beneficiaries to obtain court approval to use SNT assets.

18.     From its establishment until approximately 2008 or mid-2009, Staunton and Govoni served on the Center's board of directors and/or in various officer positions. In 2008 or mid-2009, both Staunton and Govoni resigned from these positions.

19.     Nominal Defendants contend that Govoni, with the assistance of SF and Staunton, continued to exert control over the Center's operations after their resignations.

20.     Specifically, in or around 2009 and following their resignations, Govoni, with the assistance of Staunton and SF, effectuated the transfer of $50 million from SNT accounts ostensibly as a loan to BFG.

1072850\324380293.v1

21.     Govoni allegedly founded BFG, and Staunton is a member of and controlled BFG with Govoni.

22.     On or around January 1, 2012, the Center transferred an additional $50 million from SNT accounts to BFG for a purported loan, again allegedly orchestrated by Govoni with the assistance of Staunton and SF.

23.     Nominal Defendants contend that the SNT representatives and their beneficiaries did not receive notice of and did not authorize the transfers (and allegedly had no knowledge of the diversion of their trust assets prior to the Center's bankruptcy proceedings commenced in 2024).

24.     The collective $100 million loan allegedly matured on or about January 1, 2017.

25.     The Center contends it first learned of the collective $100 million loan in April 2022 when a vice president and director of the Center resigned from her position, leaving behind an unsigned letter from BFG to the Center's board, in which BFG sought to modify the terms of the loan after it had matured.

26.     On February 9, 2024, the Center filed for bankruptcy, reporting that over 1,500 SNTs are missing all or part of their assets. The Center's bankruptcy trustee has commenced legal action against BFG and Govoni for default under the loan but does not anticipate that BFG or Govoni have the financial wherewithal to fully repay amounts owed to the Center.

27.     **The Chamberlin Class Action.** On February 19, 2024, the Chamberlins filed the Chamberlin Class Action. On April 4, 2024, the Chamberlins filed the operative Amended Complaint. A copy of the Chamberlin Class Action Amended Complaint is attached hereto as **Exhibit B**.

1072850\324380293.v1

28.     Therein, the Chamberlins contend that Govoni, with assistance from Staunton and his firm, SF, established the Center in 2000 and exercised control over its operations, including the creation and pooling of SNTs. In relevant part, the Chamberlins contend:

> The Center created individual SNT agreements and retained the services of a law firm owned by Staunton to draft those agreements and represent the Center in negotiating with and entering into the SNTs with the Beneficiaries. Staunton's law firm, Staunton and Faglie, PL, also acted to represent the interests of the grantors of those trusts, typically the guardians of the Beneficiaries. Staunton's law firm would make court appearances to file and present motions to have courts approve the use of SNTs for the Beneficiaries' assets, and under which the Center would then serve as the trustee. Though the conflict of interest was not sufficiently disclosed, Staunton's law firm was paid millions of dollars by the Center since resigning as its director, and was also paid fees to represent the SNT grantors and Beneficiaries.

Chamberlin Amended Complaint, ¶ 53.

29.     In or around 2009, both Govoni and Staunton resigned from their positions with the Center, but continued to exert "direct control" over the Center's operations. In exercising this control, the Chamberlins allege that the Center extended two $50 million loans to BFG, a purported "credit facility," founded and controlled by Govoni and Staunton. The Center allegedly first became aware of the collective $100 million loan in or around April 2022, following the resignation of "Janicki," who left behind an unsigned November 11, 2021 letter from BFG to the Center's board of directors, whereby Govoni purportedly sought to modify the terms of the loan after the loan had matured.[1] It was allegedly not until September 2023 that the Center demanded repayment of the $100 million from BFG. The Chamberlins assert that "BFG has indeed been unable to repay its debts as they become due, including the over $100,000,000 debt owed to the SNTs for the purported BFG Loan." Chamberlin Amended Complaint, ¶ 356.  Unable to collect

---

[1]     While the Chamberlin Amended Complaint does not identify the role of Janicki, other complaints and materials indicate she was a vice president and director for the Center.

on the loan, the Center filed for bankruptcy in February 2024. The Chamberlins allege that defendants to the Chamberlin Class Action participated in, caused, allowed, or aided and abetted the misappropriation of $100 million of trust assets.

30.     With respect to Staunton, the Chamberlin Class Action asserts the following causes of action: Count I: Conversion; Count II: Breach of Fiduciary Duty; Count V: Aiding and Abetting Breach of Fiduciary Duty; Count VII: Negligence; and Count XIII: Declaratory Relief – Alter Ego.

31.     **The Orris Class Action.** On April 9, 2024, Orris filed the Orris Class Action. On April 25, 2024, Orris filed the operative Amended Complaint. A copy of the Orris Class Action Amended Complaint is attached hereto as **Exhibit C**.

32.     Therein, Orris alleges that the Center was established by Govoni and Staunton in 2000 to offer administrative services to impoverished people with disabilities who have SNTs. Orris contends that "[t]he Center created individual SNT agreements and retained the services of a law firm owned by Staunton to draft those agreements and represent [t]he Center in negotiating with and [sic] the pooled SNT at the beneficiaries' death." Orris Amended Complaint, ¶ 43. While Govoni and Staunton purportedly resigned from their positions at the Center sometime in 2008 or 2009, Orris contends "Govoni continued to control and exert influence over [t]he Center's operations and finances." Orris Amended Complaint, ¶ 47. Orris alleges through Govoni's continued control over the Center, he effectuated the transfer of the two loans totaling $100 million and covered up the transfer of trust assets by causing the Center to utilize the services of an accounting firm and IT firm both formed and controlled by Govoni. In February 2024, the Center filed a petition for Chapter 11 bankruptcy which is allegedly the first time the Center "reveal[ed] that the money is gone leaving [Orris] and the Class to suffer the consequences." Orris Amended

1072850\324380293.v1

Complaint, ¶ 3. Orris contends that as a result of defendants' acts and omissions, Orris and the Class have been injured by the misappropriation and conversion of trust assets.

33.     With respect to Staunton, the Orris Class Action asserts the following causes of action: Count I: Breach of Fiduciary Duty and Count II: Negligence.

34.     **The Mulholland Lawsuit.** On March 18, 2024, Mulholland filed the Mulholland Lawsuit in Florida state court. On February 3, 2025, Mulholland filed the operative First Amended Complaint. A copy of the Mulholland Lawsuit First Amended Complaint is attached hereto as **Exhibit D**.

35.     Therein, Mulholland contends she retained Faglie and SF[2] to resolve a Medicaid lien to maximize the net proceeds available from a tort recovery for the benefit of JF, a disabled adult, whose SNT was under the complete control of the Center and for which the Center served as Trustee. Mulholland contends that Faglie and/or SF simultaneously represented the Center, creating an undisclosed conflict of interest. Mulholland asserts that Faglie and SF failed to disclose this conflict and to advise her of the "dangerous financial condition of [the Center], and [the Center's] likely, if not actual, mishandling of beneficiaries' funds." Mulholland First Amended Complaint, ¶ 17. Rather, defendants purportedly deposited the entirety of the tort settlement proceeds with the Center, in violation of their fiduciary duties. Mulholland alleges that "[o]n February 13, 2024, the [p]laintiff was notified that all of her money that had been directed by the [d]efendants to be entrusted to [the Center] had vanished, and this vulnerable and disabled adult's entire special needs trust account had a 'zero balance'." Mulholland First Amended Complaint, ¶ 20.

---

[2]     The First Amended Complaint in Mulholland adds the entity of Floyd Faglie, PL as a defendant, and includes such entity in the fact allegations made jointly against all defendants, including Faglie and SF.

36.     Mulholland asserts the following relevant causes of action: Count I: Breach of Fiduciary Duty against Faglie; Count II: Violation of Florida Statute § 415.1111 against Faglie; and Count IV: Claim against SF for the Actions and Omissions of Faglie.

37.     **Claims and Demands.**   Following their respective service in the foregoing lawsuits, Staunton, Faglie, and SF submitted the actions to Medmarc. Medmarc has assumed the defense of Staunton, Faglie, and SF in the respective actions under full and complete reservations of rights.

38.     Medmarc has received demands from two Nominal Defendants seeking payment of the applicable Policy limits to resolve their select claims.

## THE MEDMARC POLICY

39.     Medmarc issued the Policy to SF for the **policy period** incepting March 23, 2023 and ending on December 31, 2023 due to cancellation.  Please see **Exhibit A** attached hereto.

40.     The Policy issued by Medmarc contains the following insuring language:

**2.1.1.** The **Company** will pay on behalf of the **Insured** all sums up to the Limit of Liability shown in Item 4 of the Declarations and in excess of the Deductible amount shown in Item 5 of the Declarations that the **Insured** shall become legally obligated to pay as **damages** because of any **claim** or **claims**, including **claim(s)** for **personal injury**, first made against the **Insured** and first reported to the **Company** during the **policy period**, involving any act, error, or omission in rendering or failing to render **professional services** by the **Insured** or by any person for whose acts, errors, or omissions the **Insured** is legally responsible, provided that the act, error, or omission first occurred on or after the **Retroactive Date** and that no **Insured** knew or should have known of facts that reasonably could have been expected to result in a **claim** prior to the effective date of this **policy**.

**2.1.2.** An act, error, or omission that is continuing in nature shall be deemed to have occurred only on the date on which that act, error, or omission or series of related acts, errors, or omissions began and not on any subsequent date. Related acts, errors, or omissions shall be deemed to have occurred on the date that the earliest of such acts, errors, or omissions began.

1072850\324380293.v1

41.    The **Named Insured** under the Policy is SF. The Policy is amended by a Schedule of Lawyers Endorsement which identifies both Staunton and Faglie as **Insureds** under the Policy.

42.    In relevant part, the Policy contains the following definitions in Section 1:

**Claim** means a demand or suit for **damages** received by the **Insured**, including any arbitration proceedings to which the **Insured** is required to submit or to which the **Insured** has submitted with the **Company's** consent.

\*        \*        \*

**Company** means the insurance company shown in the Declarations and its successors or assigns, predecessors-in-interest, and affiliated entities.

\*        \*        \*

**Continuous coverage effective date** means the effective date of the earliest **policy** issued by the **Company** to the **Insured** that is followed by a continuous and unbroken period in which the **Company** provided professional liability insurance coverage to the **Insured**.

\*        \*        \*

**Damages** means monetary judgments, awards, or settlements, but does not include (a) the return or restitution of legal fees, costs, and expenses charged by the **Insured** and interest thereon; (b) any funds belonging to or owed to any **Insured's** client, trust account funds, or funds of any other person held by any **Insured** in any capacity, that are allegedly misappropriated, whether by an **Insured** or any other person, and whether intentionally or not, or interest thereon; or (c) fines, sanctions, penalties, punitive damages, exemplary damages, or any award resulting from the multiplication of compensatory damages, imposed against any **Insured**, any client of an **Insured**, or any other person or entity.

\*        \*        \*

**Investment advice** means giving advice regarding the value of an investment; or recommending investment in, purchase of, or sale of a particular investment; or managing any investment; or buying or selling any investment for another; or acting as a broker for a borrower or lender; or performing economic analysis of any investment; or inducing others to make a particular investment; or giving advice where the compensation for such advice is contingent upon the performance of a particular investment.

\*        \*        \*

**Policy period** means the period from the effective date of this **policy** to the expiration date or earlier termination date of this **policy**.

\*        \*        \*

**Professional services** means services rendered by an **Insured** as a provider of legal services in a lawyer-client relationship. **Professional services** shall also include activities of an **Insured** as a mediator, arbitrator, title insurance agent, notary public, administrator, conservator, receiver, executor, guardian, or trustee, or in any similar fiduciary capacity, or as a member of a formal accreditation, ethics, peer

- 13 -

review, licensing, standards review, bar association, or similar professional board or committee, or as an author, publisher, or presenter of legal research.

43.     Coverage under the Policy is limited by various exclusions and limitations, including the following:

**SECTION 4. EXCLUSIONS**

**4.1. WHAT THIS POLICY DOES NOT INSURE**

This **policy** does not apply to:

a)      any **claim** involving willful wrongdoing or any dishonest, criminal, malicious, or fraudulent act, error, or omission by any **Insured**, provided, however, that the **Company** will defend any **claim** alleging liability excluded by this paragraph until such time as the **Insured** is adjudged to be liable to pay because of such conduct or is adjudged to have committed, or pleads guilty to, an act, error, or omission described in this paragraph. The **Company** will not indemnify an **Insured** for any **damages** the **Insured** is adjudged to be liable to pay because of such conduct;

                        *        *        *

c)      any **claim** made against any **Insured** involving any **Insured's** (1) activities or status as an owner, partner, officer, director, member, principal, stockholder, employee, or independent contractor of an entity (other than a prior law firm) not named in the Declarations, or (2) arising out of the provision, or failure to provide, **professional services** to such entity by an **Insured**;

                        *        *        *

i)      any claim involving the rendering of or failure to render **investment advice**;

                        *        *        *

s)      any **claim**, disciplinary action, or other legal action involving any circumstance, act, error, or omission (1) disclosed in the information and representations made by the **Insured** in connection with the application submitted to the **Company** prior to the **continuous coverage effective date**; (2) reported to another insurance carrier prior to the **continuous coverage effective date**; or (3) that occurred prior to the **continuous coverage effective date**, if on that date, the **Insured** knew or believed, or had reason to know or believe, that the circumstance, act, error, or omission

- 14 -

might reasonably be expected to result in a **claim**, disciplinary action, or other legal action against the **Insured**; and

t) any **claim** or other request involving or relating to any conversion, improper commingling, theft, or misappropriation, whether by an **Insured** or any other person, and whether intentionally or not, of funds belonging to or owed to any **Insured's** client, or trust account funds, or funds of any other person held by any **Insured** in any capacity;

u) any **claim** or other request relating to, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any improper transfer, payment or delivery of funds, money, securities or property caused or induced by false, fraudulent or unauthorized instructions.

Notwithstanding the above, this exclusion shall not apply to consequential damages incurred by a third party (or claimant) as a result of such improper transfer, payment or delivery of funds, money, securities or property caused or induced by false, fraudulent or unauthorized instructions: provided however in no event shall this Policy provide coverage for the amount of such funds, money, securities or property transferred.

## COUNT I
## DECLARATION REGARDING "DAMAGES" AND EXCLUSION 4.1.t)

44. Medmarc hereby incorporates by reference and restates paragraphs 1-43 as if fully stated herein.

45. The foregoing insuring language of the Policy only affords coverage for sums that an **Insured** becomes legally obligated to pay as **damages**.

46. **Damages**, in relevant part, do "not include . . . any funds belonging to or owed to any **Insured's** client, trust account funds, or funds of any other person held by any **Insured** in any capacity, that are allegedly misappropriated, whether by an **Insured** or any other person, and whether intentionally or not, or interest thereon[.]"

47. Relatedly, the exclusion in Section 4.1.t) precludes coverage for

1072850\324380293.v1

any **claim** or other request involving or relating to any conversion, improper commingling, theft, or misappropriation, whether by an **Insured** or any other person, and whether intentionally or not, of funds belonging to or owed to any **Insured's** client, or trust account funds, or funds of any other person held by any **Insured** in any capacity[.]

48.    Notably, neither the exclusionary portion of the definition of damages nor the exclusion in Section 4.1.t) requires the misappropriation of client and/or trust account funds be committed by an **Insured** or committed intentionally.

49.    The underlying theme of all Nominal Defendants' allegations concerns the conversion, misappropriation, or unauthorized transfer of client and/or trust account funds, resulting in missing SNT assets.

50.    The Chamberlins assert an explicit cause of action against Staunton (among other defendants) for the conversion of trust assets and contend the case involves a scheme "to misappropriate over $100,000,000 of special needs trust assets . . . ." Chamberlin Amended Complaint, ¶ 1.

51.    Orris alleges that BFG "wrongfully misappropriated and converted from Plaintiff's and Class members' SNTs." Orris Amended Complaint, ¶ 135. Likewise, Orris contends that the negligence of Staunton and others allowed the "SNT account funds to be converted, misappropriated, and wasted." Orris Amended Complaint, ¶116(a). Further, Orris filed the Orris Class Action "to seek the return of misappropriated funds." Orris Amended Complaint, ¶ 6.

52.    Mulholland contends that Faglie (and by extension, SF) owed a duty to advise Mulholland, local, state, and federal authorities, and the Florida bar of the Center's likely or actual misappropriation, mishandling, and improper and illegal use of the beneficiaries' trust account funds. Mulholland First Amended Complaint, ¶¶ 23 and 27. As an alleged result of breaching said duty, all of Mulholland's "money that had been directed by [Faglie and SF] to be entrusted to [the

Center] had vanished, and this vulnerable and disabled adult's entire special needs trust account had a 'zero balance'." Mulholland First Amended Complaint, ¶ 20.

53.     Based on the nature of the Nominal Defendants' putative losses and the allegations asserted in the foregoing complaints, the claims actually or potentially asserted against Staunton, Faglie, and/or SF do not entail **damages**, since this matter concerns the loss of trust account funds and/or client funds purportedly misappropriated, whether or not by an **Insured** directly, and whether or not intentionally misappropriated.

54.     Likewise, the **claims** actually or potentially asserted involve or relate to the conversion, improper commingling, theft, or misappropriation of funds belonging to either clients of the **Insured** or trust account funds. As such, the exclusion in Section 4.1.t) otherwise precludes coverage for the **claims**.

55.     Because the claims asserted by Nominal Defendants do not involve **damages**, as that term is defined, and would otherwise be precluded by the exclusion in Section 4.1.t), coverage is not implicated or afforded under the Policy. Accordingly, there is no coverage for the $100 million transferred from the Center's trust accounts as part of the BFG loan.

## COUNT II
## <u>DECLARATION REGARDING PRIOR KNOWLEDGE AND EXCLUSION 4.1.s)</u>

56.     Medmarc hereby incorporates by reference and restates paragraphs 1-43 as if fully stated herein.

57.     In relevant part, the Policy only affords coverage "provided . . . that no **Insured** knew or should have known of facts that reasonably could have been expected to result in a claim prior to the effective date of this policy." (See Section 2.1.1.)

1072850\324380293.v1

58.    Relatedly, and in relevant part, the exclusion in Section 4.1.s) precludes coverage for

> any **claim** . . . or other legal action involving any circumstance, act, error, or omission . . . that occurred prior to the **continuous coverage effective date**, if on that date, the **Insured** knew or believed, or had reason to know or believe, that the circumstance, act, error, or omission might reasonably be expected to result in a **claim** . . . or other legal action against the **Insured[**.]

59.    The **continuous coverage effective date** is defined in the Policy as the effective date of the earliest policy issued by Medmarc to SF followed by a continuous and unbroken period in which Medmarc provided professional liability coverage to SF. The Policy is the first and only policy that Medmarc issued to SF, so the **continuous coverage effective date** incepted on March 23, 2023 and ran concurrently with the **policy period**.

60.    Nominal Defendants contend that Staunton, Faglie, and SF have represented the Center for over a decade.

61.    Certain Nominal Defendants allege that Staunton engaged in conversion of trust assets via the 2009 and 2012 BFG loans. Likewise, all Nominal Defendants contend that Staunton, Faglie, and/or SF knew or should have known of the purported loans and putative trust mismanagement or losses by way of their representation of the Center, and breached alleged legal and/or fiduciary duties owed to each of the Nominal Defendants arising from such knowledge.

62.    As such, the **Insureds** allegedly knew or should have known of facts that reasonably could have been expected to result in a claim prior to the effective date of the Policy. Likewise, the **Insureds** knew of circumstances that occurred prior to the **continuous coverage effective date** the **Insureds** knew or believed, or had reason to know or believe, that the circumstances might reasonably be expected to result in a **claim** against the Insureds.

1072850\324380293.v1

63.     Accordingly, the actual or potential claims asserted by the Nominal Defendants against Staunton, Faglie, and/or SF fail to satisfy the explicit language of the Policy's insuring language, or are otherwise precluded by exclusion in Section 4.1.s), and therefore fail to implicate coverage. As such, there is no coverage for the $100 million transferred from the Center's trust accounts as part of the BFG loan.

### COUNT III
### DECLARATION REGARDING EXCLUSION 4.1.a)

64.     Medmarc hereby incorporates by reference and restates paragraphs 1-43 as if fully stated herein.

65.     The exclusion in Section 4.1.a), in relevant part, precludes coverage for "any **claim** involving willful wrongdoing or any dishonest, criminal, malicious, or fraudulent act, error, or omission by any **Insured**[.]"

66.     Certain Nominal Defendants contend that Staunton did not merely fail to stop the unauthorized transfers of trust assets but knowingly converted trust assets by way of his direct involvement in the Center's operations. Likewise certain Nominal Defendants contend that Defendants knowingly assisted in the breach of fiduciary duties owed to the SNT beneficiaries. Each operative complaint filed by a Nominal Defendant includes allegations of claims involving, in whole or in part, "willful wrongdoing or any dishonest, criminal, malicious, or fraudulent act, error, or omission" that were asserted to be committed by the Insured(s) named as party defendant(s) in such complaint.

1072850\324380293.v1

67.     **Claims** arising out of such willful and knowing conduct is expressly excluded under the exclusion in Section 4.1.a). Accordingly, there is no coverage for the $100 million transferred from the Center's trust accounts as part of the BFG loan.

### COUNT IV
### DECLARATION REGARDING EXCLUSION 4.1.c)

68.     Medmarc hereby incorporates by reference and restates paragraphs 1-43 as if fully stated herein.

69.     The exclusion 4.1.c) in the Policy precludes coverage for "any **claim** made against any **Insured** involving any **Insured's** . . . activities or status as an owner, partner, officer, director, member, principal, stockholder, employee, or independent contractor of any entity . . . not named in the Declarations" (i.e., SF).

70.     Certain Nominal Defendants allege wrongful acts of Staunton in his role as a former founder and officer of the Center, and/or in his role as a member of BFG. In other words, Defendants seek coverage for claims asserted by certain Nominal Defendants arising out of Staunton's activities with the Center and BFG, rather than with SF. Claims arising from such activities are explicitly excluded from coverage under Section 4.1.c) of the Policy. Accordingly, there is no coverage for the $100 million transferred from the Center's trust accounts as part of the BFG loan.

### COUNT V
### DECLARATION REGARDING EXCLUSION 4.1.i)

71.     Medmarc hereby incorporates by reference and restates paragraphs 1-43 as if fully stated herein.

1072850\324380293.v1

72.     The exclusion in Section 4.1.i) precludes coverage for "any **claim** involving the rendering or failure to render **investment advice**."

73.     In relevant part, **investment advice** includes the "buying or selling any investment for another[.]"

74.     Certain Nominal Defendants contend that Staunton continued to exert control over the Center after his resignation and exercised such control by causing the Center to extend the two loans to BFG totaling $100 million.

75.     According to the Chamberlin Amended Complaint, Govoni was principal of another entity, Boston Asset Management ("BAM"), which "provided investment management and marketing services for the SNT assets that were purportedly *invested via the BFG loan*." Chamberlin Amended Complaint, ¶ 89 (emphasis added). Stated differently, Staunton directed the loans to BFG which were purportedly an investment.[3]

76.     Additionally, according to the Orris Complaint, Staunton's permitting of the transfer of over $100 million from SNT accounts to one or more BFG accounts, for the purported BFG loan, was never a reasonable investment. Orris Complaint ¶ 104.

77.     Certain Nominal Defendants' claims against Defendants arising from such investment activities are precluded from coverage under the Policy. Accordingly, there is no coverage for the $100 million transferred from the Center's trust accounts as part of the BFG loan.

---

[3] The Chamberlin Amended Complaint further asserts that Staunton owned stock in BAM and controlled the operations and affairs of both BAM and BFG with Govoni and another defendant. Chamberlin Amended Complaint, ¶22.

1072850\324380293.v1

## COUNT VI
## DECLARATION REGARDING EXCLUSION 4.1.u)

78.     Medmarc hereby incorporates by reference and restates paragraphs 1-43 as if fully stated herein.

79.     The exclusion in Section 4.1.u), in relevant part, precludes coverage for "any **claim** or other request relating to, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any improper transfer, payment or delivery of funds . . . caused or induced by false, fraudulent or unauthorized instructions."

80.     In this case, certain Nominal Defendants contend that the SNT beneficiaries authorized neither the Defendants nor the Center to transfer trust assets as part of the BFG loans. Despite no authorization to do so, Staunton (along with other underlying defendants) exerted direct control over the Center and effectuated the collective $100 million BFG loan. In other words, the improper transfer of trust assets was caused by the unauthorized directions of the Center's principals, including Staunton.

81.     **Claims** arising out of such improper transfers caused by unauthorized instructions are precluded from coverage by the exclusion in Section 4.1.u). Accordingly, there is no coverage for the $100 million transferred from the Center's trust accounts as part of the BFG loan.

WHEREFORE, Plaintiff MEDMARC CASUALTY INSURANCE COMPANY respectfully requests this Honorable Court to enter judgment in its favor as follows:

A.     Declare that no coverage exists, or in the alternative, coverage is limited, under the Policy for the Nominal Defendants' claims and lawsuits asserted against SF, Staunton, and Faglie.

1072850\324380293.v1

B.  Declare that Medmarc has no duty to defend or indemnify SF, Staunton, and/or Faglie under Policy with respect to Nominal Defendants' claims and lawsuits.

C.  Enter a Bar Order in the immediate bankruptcy proceedings barring any further claims against any insured under Policy No. 23MCFL000142 related to or arising out of any insured's work for or relationship to any other Defendant to these proceedings, including the Center;

D.  Award Medmarc any and all such other relief this Honorable Court deems just and proper under the circumstances.

Dated:      April 4, 2025

<div style="margin-left:40%">

**HINSHAW & CULBERTSON LLP**
*/s/ Rory Eric Jurman*
Rory Eric Jurman
Florida Bar Number 194646
rjurman@hinshawlaw.com
201 East Las Olas Blvd.
Suite 1450
Ft. Lauderdale, FL  33301
*Counsel for Plaintiff*
Telephone:  954-375-1141

Ruel W. Smith, Esquire
Florida Bar Number 0036548
rsmith@hinshawlaw.com
100 South Ashley Drive
Suite 1310
Tampa, FL 33602
Telephone: 813-276-1662
Facsimile: 813-436-8738
*Counsel for Plaintiff*

Siobhan E. P. Grant, Esquire
Florida Bar Number 68892
sgrant@hinshawlaw.com
*Counsel for Plaintiff*

</div>

1072850\324380293.v1